### J. M. AUTRY v. THE STATE.

No. 21588. Delivered October 8, 1941.
Rehearing Denied January 14, 1942.
Application for Leave to File Second Motion for Rehearing
Denied (Without Written Opinion) February 4, 1942.

The opinion states the case.

*W. S. Ethridge,* of Bandera, and *Morriss & Morriss,* of San Antonio, for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was convicted of murder with malice and sentenced to serve twenty-five years in the penitentiary.

The facts show that Hal Smith, the deceased, a brother-in-law of appellant, had some kind of an argument or difficulty with appellant, who was a constable, and during the controversy appellant's pistol was discharged, and a bullet therefrom striking the deceased just back of the left arm and ranging down through the vital organs of his body, and lodged in his right crotch, from which wound the deceased shortly died.

The facts surrounding the shooting were strongly contested, the State's witnesses testifying to what could be termed a useless and unprovoked killing, while appellant's testimony evidenced a struggle between the two contestants and an accidental firing of the fatal shot from appellant's pistol. Suffice it to say, these theories were both presented to the jury under proper and liberal instructions, and under our system of jurisprudence the jury's sanction thereof is binding upon this court in such disputed matters of fact.

The record is voluminous and contains many bills of exceptions, the important ones of which we will endeavor to notice.

The fatal difficulty took place near a gate and close to or in a motte of timber, which position was on the apex of a triangle, another angle thereof being the location of the home of the deceased, and the third angle being a wash place near a water well where the sister of the deceased, who was appellant's wife, and the mother of the deceased were located.

Mrs. Smith, the wife of the deceased, testified, over objections, that she was at her home on the morning of the trouble and heard appellant's wife say "Oh Jess, don't," and then a shot, and she immediately ran out of her house and saw her

husband on the ground and appellant on top of the deceased choking him; that Mrs. Autry pulled appellant off the deceased, and the mother of deceased then said "Jess shot him." She immediately went to her husband, who walked toward the house and was calling for his gun, and the deceased then walked to the well, about 250 feet away, and bathed his face, at which time he made a statement to his wife, giving his version of this transaction. This statement was admitted as res gestae, and its admission is the basis of bills of exception to its admission. The witness then ran back to her house and got an automobile, and came and took the deceased, the appellant's wife, the deceased's mother, and the deceased's nine-year-old son Frank and drove to Medina City, about three miles away, to a doctor. This trip ended in town, so the witness said, all in about 20 or 25 minutes after the shooting. On the way into town Mrs. Hal Smith testified her husband told her that he was going to die, that he could not get well, and then related his version of what occurred at the scene of the fatal shooting.

Bills of exceptions Nos. 1 and 2 complain because of the small number of special venirmen contained in the jury panel first presented to this appellant from which number a jury was to be selected, the number being 40 jurors. The main complaint being that evidently from such a small number there would not be enough men qualified, and it would be necessary to summon talesmen, which duty would ordinarily devolve upon the sheriff, and appellant contended that the sheriff was actively assisting the prosecution herein, and would be prejudiced in thus selecting and summoning such desired talesmen. The trial court overruled a motion to quash the venire, but did appoint a constable of a Bandera County precinct, without objection upon appellant's part, to summon such talesmen.

It will be observed that this was a special term of court, and that Bandera County is not under the jury wheel system; that its population in 1940 was 4,234; that Art. 593, C. C. P. provides, among other things, that the jury commissioners shall select one man for every 100 inhabitants of the county, or a greater or less number, as directed by the court, which persons shall constitute a special venire list, from which list shall be drawn the names of those who shall answer summons to the special venire facias, etc. We think the trial court was within his rights when he thus exercised his discretion

Bills of exceptions Nos. 3 and 4 relate to the introduction of

a statement made by the deceased while he was being carried to the doctor at Medina City, which statement was testified to by Mrs. Hal Smith, the wife, and Frank Smith, the son of the deceased. Such statement was admitted as both res gestae and as a dying declaration under the predicate laid by the testimony of Mrs. Hal Smith. It was shown that Mrs. Hal Smith heard screaming and heard a shot and ran out of her home up to the scene of the difficulty, and appellant was down on the deceased choking him, and appellant's wife pulled appellant off the deceased, her brother; it took about a minute for the witness to arrive at the scene. The witness further said that when her husband got off the ground appellant followed him with the gun in his hand, and said "If you don't stop, I am going to shoot you again," at which time the deceased holloed "Marty bring me my thirty-thirty." That she ran back and got the car parked by the side of the house, and her husband walked some distance and sat by the well washing his face, and she asked him where he was shot, and he said "in the back," and she said "Where did the bullet come out?" and he said "It did not come out," and by that time they started to town. That when they got in the car the deceased told her "I am going to die, get me to a doctor, and let's see what he says, but I know I am going to die." "He said it was not anything but just cold-blooded murder. * * * From the time we left the house where the shooting occurred until we got in the doctor's office in Medina it took about ten minutes to get there, probably twenty minutes in all from the time of the shooting, maybe twenty-five, not more than twenty-five." The trial court's qualification shows that this testimony was admitted as res gestae and the latter portion thereof as a dying declaration. It is shown that this witness was actually present at the end of this assault and saw the latter portion thereof, and what she recounted on the stand as to what she saw and heard was surely res gestae or the transaction itself, and took place in the presence of appellant. The portion of her testimony as to what took place in the car on the trip to town was sufficiently near to the time of the transaction to have also been called res gestae; but the statement was also, according to her uncontradicted testimony, given in contemplation of the death that actually followed soon thereafter. True it is that the phrase "he said it was not anything but just cold-blooded murder" strongly bears the marks of a conclusion of the declarant, yet same has been often characterized by the courts as a shorthand rendition of the facts. We find an exact counterpart to the present state-

ment in the case of Finley v. State, 92 Texas Crim. Rep. 543, 244 S. W. 526, in which the dying declaration contained the following statement:

"I do not know the man's name who shot me. He shot me in cold blood. I was trying to prevent trouble between two other men when he shot me."

This court held that such a statement was but a shorthand rendition of the facts, and there we find many cases cited justifying such holding. In the Sims' case, 36 Texas Crim. Rep. 156, this court held admissible a declaration to the effect that "Sims ought not to have shot me," and in Connell v. State, 46 Texas Crim. Rep. 261, a statement to the effect that "He had no cause for doing it," was held admissible. The Bateson case, 46 Texas Crim. Rep. 34, to which we are cited, which bears a different construction to the just above cited cases, has been overruled by this court on that point in the Clark case, 56 Texas Crim. Rep. 293. It is our conclusion that in the first instance the statement thus testified to by Mrs. Hal Smith was res gestae of the transaction, and in support of this proposition we quote from Freeman v. State, 239 S. W. 969, as follows:

"Many authorities hold that when a condition of suffering exists from the infliction of the injury to the making of the statement in a given case it might extend far enough to preclude premeditation and in cases of this kind we have declined to be limited to any specific time. Tooney v. State, 8 Tex. App. 459; Stagner v. State, 9 Tex. App. 441; Fulcher v. State, 28 Tex. App. 471, 13 S. W. 750; Lewis v. State, 29 Tex. App. 201, 15 S. W. 642, 25 Am. St. Rep. 720; Castillo v. State, 31 Tex. Cr. R. 145, 19 S. W. 892, 37 Am. St. Rep. 794; Moore v. State, 31 Tex. Cr. R. 236, 20 S. W. 563; King v. State, 34 Tex. Cr. R. 237, 29 S. W. 1086; Freeman v. State, 40 Tex. Cr. R. 545, 46 S. W. 641, 51 S. W. 230; Chapman v. State, 43 Tex. Cr. R. 328, 65 S. W. 1098, 96 Am. Rep. 874. Reference to these cases will disclose that statements made at times varying from 20 minutes to a longer period than an hour and a half were admitted as res gestae under appropriate surroundings."

This holding also disposes of the statement of Frank Smith relative to what he heard his father say while in the car going to Medina City concerning the transaction in which the father lost his life as reflected in bill of exceptions No. 7.

Exception was also reserved to the testimony of witnesses

as shown by bills Nos. 8, 9 and 10 as to what purported to be a dying statement made by the deceased at the hospital just before an anesthetic was administered to him in an effort to relieve him from the effects of the bullet in his body. It was shown that when the opening portion of such statement relative to being conscious of approaching death and having no hope of recovery was read to the deceased he merely nodded his head in affirmation thereof, so the witnesses testified, and under the circumstances we think such an affirmation was sufficient to show an abandonment of all hope by such sign as conclusively as if he had made such statement orally; and especially would this apply in the presence of the statement made some short time prior thereto to his wife, and the information conveyed to the deceased that it was very doubtful if he could survive the operation. We make the observation that this statement thus made by the deceased was properly admitted as a dying declaration, and thus overrule the bills of exception relative thereto. We note that the State's proof authorized the finding of the presence of all of such elements.

It is also noted that the careful trial court submitted in his charge to the jury the different constituents of a dying declaration, and instructed them that they should not consider same for any purpose unless they believed that the deceased was conscious of approaching death, with no hope of recovery; that same was voluntarily made, and not through persuasion; not in answer to interrogatories calculated to lead to the making of such statement, and that his mind was sane at such time.

Bill No. 10 relates to the trial court's refusal to allow the appellant to prove what he said to the sheriff of Bandera County at the time he surrendered to such sheriff relative to the shooting being accidental. This was a self-serving declaration made after a motive to fabricate had arisen, and was not admissible. See Rains v. State, 146 S. W. (2d) 176.

Bill of exceptions No. 13 complains because of the State being allowed to prove over appellant's objection a portion of a conversation had between the deceased and one Collins, in which the deceased was alleged to have asked the witness did Collins think deceased was going to die, and upon being reassured by Collins that deceased was not going to die, then the appellant brought out the statement by deceased that he would live to kill appellant. After this testimony was given, the State asked the witness what else was said in this conversation, and the trial court allowed the State to show by Collins that the deceased

also said "he shot me in cold blood * * * he shot me in the back and running." This latter portion of the conversation inquired about seems to be admissible under Art. 728, C. C. P.

Bills Nos. 14 and 15 relate to a conversation had between appellant and his wife in the presence of one Rev. Gossett while appellant was confined in the Bandera County jail. Appellant's wife was an eye witness to the tragedy and gave testimony in his behalf damaging to the State. It was shown by appellant's testimony that he sustained certain bruises and scratches in the fatal difficulty which were said by him to have been inflicted by the deceased. This impeaching testimony of Rev. Gossett was to the effect that the wife told the appellant in his presence relative to those scratches on his neck: "Yes, I know I done it pulling you off from Hal (the deceased)." And that she further made the statement at such time that her brother, the deceased, was trying to get away from appellant and that her husband shot him in the back.

The appellant's wife had testified fully in regard to the difficulty and made out a case different in some respects from the statement made in Rev. Gossett's presence. She also denied making such statement, and after laying a predicate therefor the State was permitted to prove the making of such by the witness Gossett. She had previously fully testified relative to the whole transaction and became as any other witness subject to impeachment upon all matters which the appellant had seen fit to question her about. The trial court, however, very properly limited the effect of such testimony only as to her credibility as a witness. We think his ruling was correct in this matter. See Glover v. State 152 S. W. (2d) 747 and cases there cited.

We have examined bill No. 17 and do not think the same evidences any error.

Bills Nos. 18 and 19 relate to the same proposition as advanced in bills Nos. 14 and 15, and are governed by the ruling above set forth relative to such bills.

We see no error reflected in bills Nos. 21 and 22, they relating to certain experience and an opinion deduced therefrom of a witness who seems to have qualified as an expert in the matters inquired about.

Bill No. 23 relates to a refusal of the trial court to allow the appellant to reopen the case after same had been closed and all witnesses excused, the court stating in his qualification thereto that appellant's counsel had informed him that it would take much time to recall the witnesses relative to such matters. We think the trial court had a wide discretion in such matters, and we hold that his action herein was not an abuse thereof. It is also evident from the facts proven on the motion for a new trial that the desired testimony would have opened a controversy that would have required the presence of many witnesses upon both sides over a matter that had probably been unduly prolonged in the trial of the case.

Bill No. 24 is based upon certain remarks of the district attorney in his closing address to the jury. It is noted, however, that no objections were made nor exceptions taken thereto at the time, and we do not think same were of such a nature that they should have been calculated to unfairly influence the jury in its deliberations. The bill is overruled.

Misconduct of the jury was alleged in the motion for a new trial, and testimony taken relative thereto. It was alleged that the juror Ed Welch was not a fair and impartial juror, as well as that a further juror, Mr. Charles Moore, was also not such a juror. Much testimony appears in the record relative to Mr. Welch, some of which was admitted by him to be true, and some of which was denied by him. Taken as a whole, it seems that some person who had talked to a witness who purported to know what was said during the hurried trip to the hospital, made by the deceased and his wife, told in the juror's presence what purported to be the statement of deceased as to how the trouble happened. It was also shown that the juror had made the remark prior to having been taken on the jury, on seeing the appellant passing along the road, that "he would hate to be in his (appellant's) shoes." The juror's answer to such was that he would hate to be in anyone's shoes who was accused of murder. To the first accusation the juror said that he told the examining attorneys when on his voir dire that he had heard the neighborhood talk relative to this case, but that he had formed no opinion thereon, and had no opinion at the time he was taken on the jury. He denied any bias or prejudgment of the matter, and the trial court evidently believed him, and we think the court's discretion in the matter evidences no abuse thereof. The second juror, Charlie Moore, had died in the interim between the trial and the hearing of the motion,

and we think the trial court was again correct in his holding that the proof did not show him to be biased or prejudiced against the appellant.

We think this case has been fairly tried, with no errors evidenced by the record, and it is therefore accordingly affirmed.

ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Appellant has filed and strongly presented orally a motion for rehearing insisting that we were in error in the disposition made of the case originally.

In his motion for new trial appellant averred that two jurors, Ed Welch and Charlie Moore, were prejudiced jurors, had predetermined appellant's guilt, and had failed on their voir dire examination to truthfully disclose that they had heard the case discussed. The charges so made were investigated upon the hearing of the motion and the evidence brought forward. We learn therefrom the following:

W. H. Lewis, James Brady, Lester Heinan and Ed Welch worked together on the State highway. The killing occurred on Saturday. Upon returning to work on Monday Lewis told Brady and Welch that he (Lewis) had been told that Autry had killed Hal Smith. That was all Lewis had heard about the killing at that time. Heinan was not then present. After work hours on Monday Lewis had a conversation with one Stokes who told Lewis that he (Stokes) was with Hal Smith as he was being taken to the doctor's office at Medina, and heard Smith say that he and Autry had a falling out, got into a scuffle and Autry had shot him (Smith) in the back. Upon returning to work on Tuesday Lewis related to Welch and Brady what Stokes had said. Welch made no comment about it at the time. Upon being asked if the killing was not a frequent topic of conversation between him and Welch, Lewis testified: "No, not so much, we did not know anything about it, and really it just died out; now and then we might mention it in our work; we did not continue to discuss it; * * * it was right immediately after it happened that it was mentioned, that was all. * * *" It appears that work was being done on the road that Autry traveled. Lewis testified that on one occasion Welch said, referring to Autry, "I wonder how much longer he will be running up and down the road." At another time Welch said he

would like to hear the case, but could not afford to lose the time.

Brady testified that Heinan was the one who made the remark about appellant traveling the road and that Welch said he would hate to be in appellant's shoes. Heinan admitted that he and Welch each made the remark that they wondered how much longer appellant would be traveling up and down the road, and that Welch said he would hate to be in appellant's shoes. Heinan also testified that after the trial he heard Welch say he told some of the jurors after the State's witnesses had testified that "from now on out it will be all a pack of lies."

D. S. Palmer and Clyde C. Elam made affidavits which were introduced on the hearing of the motion and also testified to the same effect that the next week after appellant's trial Welch told them that when he was first summoned for service on the jury he thought he would disqualify, as he knew and had heard so much about the case, but that he got to thinking about how much the getting of a jury was costing the county, so he concluded he could qualify and "send him to the penitentiary as well as the next man."

The attorneys for appellant testified that on the examination of Welch as a prospective juror he said he had not heard the facts of the case discussed, nor the expression of an opinion by anyone regarding it, but had only heard of the case. The district attorney testified that on his voir dire examination Welch testified he had heard the case discussed but had formed no opinion as to appellant's guilt or innocence.

Mr. Welch testified that he had no opinion as to the case when he was examined as a juror, and that during such examination he told the attorneys that he had heard the case talked about. He did not remember saying in the presence of Lewis, Brady or Heinan that he wondered how much longer appellant would be going up and down the road, but did say that he (Welch) would hate to be in appellant's shoes, meaning that he (Welch) would hate to be in any kind of trouble. The said juror denied categorically every other statement (save one hereafter mentioned) which had been attributed to him, upon which an inference of unfairness as a juror could be predicated. From the evidence of said juror in narrative form it appears that he would usually precede a positive denial with the statement that he had no recollection, or did not remember making the statement under inquiry, following with the positive denial.

Not having heard the juror give his evidence we are not in as good a position as the trial judge to know whether the juror's answers were the result of uncertainty in his own mind, or his peculiar manner of expression.

Upon the hearing of the motion for new trial only one juror besides Mr. Welch was examined, that being Mr. Burney. He testified only that at·sometime before the evidence upon the main trial was closed some juror, whom he did not recall, expressed the opinion that appellant was guilty. Mr. Burney does not attribute such statement to Mr. Welch, neither does he testify that he heard Mr. Welch say that from now on the evidence would be a pack of lies; indeed, if he was interrogated about that at all it is not reflected from the record. It will be recalled that Heinan testified that after the trial Mr. Welch said he had told some of the jurors after the State's evidence had closed that·from now on out it would be a pack of lies. Mr. Welch testified as follows: "* * * Asked if I made any statement to any of the jurors after the State's evidence had closed that from now on it would all be a pack of lies, I answer not that I remember. * * *" This is the only material statement attributed to Welch not categorically denied. It will be noted that no juror claims that any such statement was made to them by Mr. Welch. Only Heinan claims that Welch related that he had made such statement, and Welch says he does not remember making any such statement to any juror.

Supporting his contention that Welch was a prejudiced juror appellant cites us to numerous cases, among them being Anderson v. State, 135 Tex. Cr. R. 104, 117 S. W. (2d) 465; Davis v. State, 101 Tex. Cr. R. 352, 275 S. W. 1029; Wilson v. State, 128 Tex. Cr. R. 175, 79 S. W. (2d) 852; Washburn v. State, 31 Tex. Cr. R. 352, 20 S. W. 715. Where the decision on a certain question necessarily turns upon evidence relating thereto particular cases are of little value save as they illustrate the application of certain principles, because each case must be governed by its own peculiar facts. Under the evidence here presented to the trial court we are of opinion that we would not be justified in holding that he had abused his discretion in concluding that appellant's contention that Mr. Welch was an unfair juror was not sustained. The claim that the juror Moore was prejudiced and unfair is not thought to have sufficient merit to call for discussion.

Appellant next complains in his motion that we were in error in not sustaining his objections presented in bills of ex-

ception 3 and 4, in which he sought to have excluded from the jury a statement made by deceased while on the way from the scene of the shooting to Medina.

The statement made by deceased was testified to by his wife, Mrs. Hal Smith. In discussing the point in our original opinion we inadvertently said that Mrs. Smith ran from her home "up to the scene of the difficulty." The opinion is severely criticized because of such statement. The witness claims to have seen what was occurring at the scene of the trouble when she ran out of the house, but she met her husband at the well where he had walked some 255 feet from the scene of the shooting. He had called to his wife to bring his gun to him and when his wife met him at the well he told her he was shot in the back and that the bullet did not come out. She ran immediately and got their automobile and started with deceased to Medina. According to Mrs. Smith's evidence it was not more than 25 minutes from the time of the shooting until they reached Medina. Mrs. Smith testified that after they had assisted deceased into the car and started to Medina she asked, "Hal, what on earth happened?" and that he said: "* * I opened the gate right there, and he said Jess rode up, and we spoke and I rode on (objection-exception). He said as he rode up, got a few feet behind the car, Jess hollered to stop, he said, I looked around and he was getting out of the car with a gun in his hand, and he said: I am going to shoot you, I have had enough of you, and he said, I jumped off of my horse and started to run, thought I would get behind a tree, and stumbled and stopped, and as I stopped he ran up and grabbed me, and I said, Jess, don't shoot me, you know I have not got a gun, and he jerked me and shot me, and jumped on top of me and was trying to choke me to death. That was in the automobile. He told me, I know I cannot get well (objection.) He said, I am going to die, he said, get me to a doctor, and let's see what he says, but I know I am going to die; he said it was not anything but cold-blooded murder."

The statement was objected to as being a relation of past events, lacking in spontaneity, and having been made in answer to questions. (1) Strictly speaking, any statement regarding a transaction already accomplished is a narrative of past events unless it be made while the transaction is actually transpiring. In excluding as not being res gestae the narration of some former occurrence the law does not exclude statements regarding the very act under investigation if other elements making the statements res gestae are present. The principle of "res

gestae embraces not only the actual facts of the transaction and the circumstances surrounding it but the matters immediately antecedent to and having direct casual connection with it." Washington v. State, 113 Tex. Cr. R. 291, 21 S. W. (2d) 524; 18 Tex. Jur., p. 305, Sec. 190, and cases there collated. (2) The mere fact that the statement was in response to the wife's inquiry as to "what happened" does not characterize the statement made in reply as outside the scope of res gestae. If the statement had been made in response to leading questions in the absence of instinctiveness or spontaneity it would be different. For collation of authorities see Branch's Ann. Tex. P. C., p. 53, Sec. 83; 18 Tex. Jur., Sec. 181, p. 297, and cases cited in note 8, under said section. Graves v. State, 115 Tex. Cr. R. 85, 29 S. W. (2d) 379, and cases therein cited. (3) A necessary prerequisite to render a statement admissible as res gestae is spontaneity. In determining this question the courts will—among other things—look to the condition of the declarant at the time of making the statement and all the facts surrounding him. The physician at Medina testified that deceased was in a pretty bad condition and that he did not think there was any chance to save him, and advised that he be taken to the hospital at Kerrville. The physician at Kerrville described the wound as follows:

"* * * The bullet entered below the left arm pit in just about the midline from front to back, just a little way below the arm pit; that was the point of entry, the bullet did not exit. I did not perform an autopsy, but we found the bullet at operation. Upon operating we found that the bullet ranged downward thru' the left lung, pierced the diaphragm, the stomach, the bowels, running thru' the blood vessels which nourish the bowels, near the midline, crossed to the right of the body about an inch or two and lodged in the base or the lower part of the peritoneum, where it would have continued just inside the right leg if it had come out."

On the way to Medina, according to his wife, deceased said he knew he was going to die, but to "get him to a doctor as quick as possible." It is plain that deceased had in his mind the idea of dying, which seems not surprising in view of the wound. We discovered nothing in the record which takes the statement objected to out of the realm of instinctiveness and spontaneity All that he said was with reference to the transaction in which he was shot, and was made within 25 minutes after the shoot-

ing,—without break or let-down from the moment of the shooting to the making of the statement.

Appellant renews his complaint that the trial court permitted deceased's son to testify that on the way to Medina he heard his father say "he shot me in cold-blood murder." The objection was that such expression was an opinion and conclusion of deceased and not admissible as a res gestae statement. In addition to the authorities cited in our original opinion we refer to Couch v. State, 93 Tex. Cr. R. 27, 245 S. W. 692, and Couch v. State, 103 Tex. Cr. R. 188, 279 S. W. 821, in which this precise question was discussed and the holding was adverse to appellant's contention. In the last case referred to the distinction is pointed out between such a statement when provable as res gestae and when not provable as a dying declaration.

Appellant renews his complaint brought forward in bill of exception number 13. The question is sufficiently stated in our original opinion. It is insisted by appellant in his motion that the evidence elicited from Collins by the State on cross examination was not a part of the same conversation proven by appellant. We have examined the entire bill and the evidence relating thereto. The trial court approved the bill with the following qualification. "From the examination and answers of the witness, the evidence was deemed admissible as a part of the same conversation inquired about on direct examination." We discover no reason to disagree with the trial judge's view of the matter.

Appellant complains of the treatment and disposition of the question presented in bill of exception number 21-22. On the night of January 13, 1940, the wife of deceased turned over to the sheriff at Kerrville a shirt worn by deceased at the time he was shot. The sheriff sent the shirt by a ranger to the Department of Public Safety at Austin. The shirt was examined by Mr. Arnett, who was called by the State to testify as to the result of his observations, and the result of certain experiments in firing appellant's pistol at the shirt at various distances, and his opinion based upon the result of such experiments as to the distance the gun was from the shirt when it was fired by appellant.

One objection urged by appellant was that the evidence failed to show that when the shirt was examined by Arnett it was in the same condition as immediately following the shoot-

ing. The shirt was not actually introduced in evidence, but was used in court by the witness while testifying. As supporting his objection appellant relies upon the authorities which hold that the clothing of deceased are not receivable in evidence unless shown to be in the same condition as they were immediately after the homicide. See Hart v. State, 15 Tex. Cr. App. 202; Parker v. State, 75 S. W. 30; Wharton's Cr. Ev. (11th Ed., Vol. 1, Sec. 134.) It is evidently appellant's position that if it is necessary to show that the clothing have not been tampered with since the homicide before they may be placed in evidence that the same should apply where the witness proposes to testify as to the result of his observations of the clothing at a time subsequent to the homicide. There is no direct evidence from the wife of deceased, nor the sheriff, nor from the ranger, upon the point mentioned. Mr. Arnett testified that he "saw no evidence of anybody getting any fibers out of the hole—(the hole in the shirt made by the fatal bullet)—it did not look like it at all; there did not seem to be many of the fibers missing; we fitted them back as best we could, and there did not seem to be very many of the fibers missing; most of them were there."

Unless the evidence just related supplies the necessary predicate there would seem to be support for the objection now under discussion. We do not consider the question further as we are of opinion it becomes immaterial because of matters later mentioned. The witness Arnett testified that he made various tests by shooting appellant's pistol into the shirt at distances of six inches, one foot, and two feet, and developed pictures showing the condition of the cloth as to flash burns, etc., which pictures were placed in evidence. The objection just above considered had no application to the experiments because they of necessity occurred subsequent to the homicide. The objection went to all of the evidence. In that condition, if part of the evidence was admissible and part not, in order to present a proper bill that part which was inadmissible should be singled out. If this is not done the bill has always been held too general. See Branch's Ann. Tex. P. C., Sec. 211, and the many cases there cited; Cadle v. State, 122 Tex. Cr. R. 595, 57 S. W. (2d) 147, and authorities cited. We think the bill here under consideration is subject to the defect mentioned.

The evidence of the witness Arnett based on his observation of the shirt and the experiments thereon with appellant's pistol was further objected to on the ground that it was too remote

and speculative. This objection goes more to the weight than to the admissibility of the evidence. The witness described in detail the method used in the experiments and the result thereof; this, we think, was unquestionably admissible. The objection goes to all of this admissible evidence, as well as to the opinion of the witness. If his opinion was thought to be inadmissible evidence, objection thereto should have been segregated and not confused with admissible testimony.

We adhere to the conclusion stated in our original opinion that the evidence regarding the predicate upon which to admit the dying declaration of deceased made at the hospital in Kerrville raised an issue which the trial court properly submitted to the jury. We are convinced of this after a painstaking re-examination of the entire statement of facts. Certainly this court, in view of the record, is in no position to say as a matter of law that deceased was not conscious of approaching death when the statement was made.

Other questions suggested in the motion for rehearing have not been overlooked. It is not thought necessary to discuss them.

The motion for rehearing is overruled.